## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL HALLIBURTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-02265-SHL-atc |
| | ) | |
| STEVE UPTON, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER DENYING PETITION UNDER 28 U.S.C. § 2254,
DENYING AS MOOT MOTIONS FOR JUDGMENT,
DENYING A CERTIFICATE OF APPEALABILITY,
CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND
DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

Before the Court are (1) the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF No. 1) filed by Petitioner Michael Halliburton[1]; (2) Respondent Steve Upton's Answer to the Petition For A Writ of Habeas Corpus (ECF No. 14); (3) Petitioner's Reply to Respondent As Per Rule 5(e) (ECF No. 24); and (4) Petitioner's motions for judgment (ECF No. 43, 44, 45 & 46 ("Motions")).  Because most of Petitioner's habeas claims are procedurally defaulted and the rest are without merit, the Court **DENIES** the § 2254 Petition.  As a result, the Motions are **DENIED** as moot.

---

[1] Petitioner's Tennessee Department of Correction ("TDOC") prisoner number is 00552141.  (ECF No. 1 at PageID 1.)  When Petitioner filed his § 2254 Petition, he was confined at the Trousdale-Turner Correctional Complex, in Hartsville, Tennessee.  (Id.)  He has since been released on parole and is currently assigned to the Memphis Probation and Parole Office.  See TDOC, Felony Offender Information, https://foil.app.tn.gov/foil/details.jsp (last visited September 24, 2024).

## BACKGROUND

### A.  Factual Background and Trial

On August 26, 2014, a grand jury in Shelby County, Tennessee returned an indictment charging Petitioner with (1) one count of attempted first degree murder of his wife, Virginia Halliburton, on September 6, 2012, in Shelby County, Tennessee, in violation of Tennessee Code Annotated section 39-13-202 ("Attempted Murder Charge"); (2) two counts of aggravated assault, in violation of Tennessee Code Annotated section 39-13-102 ("Assault Charges"); and (3) one count of domestic assault, in violation of Tennessee Code Annotated section 39-13-111 ("Domestic Assault Charge").  (ECF No. 13-1 at PageID 1425–29.)  See Tennessee v. Halliburton, No. W2015-02157-CCA-R3-CD, 2016 WL 7102747, at *1 (Tenn. Crim. App. Dec. 6, 2016) ("Halliburton I"), perm. app. denied (Tenn. Apr. 13, 2017).

At trial, Ms. Halliburton testified that Petitioner "tried to beat her to death with a knife sharpener after she told him she was filing for divorce."  Halliburton I, 2016 WL 7102747, at *1. Petitioner testified that he "lunged" at Ms. Halliburton after she said she wanted to divorce, but he "did not raise his fist or touch her."  Id. at *6.  The next day, Ms. Halliburton told Petitioner she was moving to an apartment.  Id.  When Petitioner realized that Ms. Halliburton would be taking their daughter, E.H., with her, he told her, "[W]ell, just get your fat ass into an apartment."  Id. Then Petitioner walked over to Ms. Halliburton's chair and told her that she was as evil as her siblings.  Id.  Petitioner testified that, as he was about to leave the room:

> he saw a bright light emanating from the lamp near where [Ms. Halliburton] was sitting.  He said the lamp appeared "100 times brighter than it was" and looked like "a giant sparkler going off and just cascading down through [his] head."  The next thing he remembered[,] [he] was standing over [Ms. Halliburton] with a knife sharpener. . . . He hit her one time with the knife sharpener, and then he heard a voice that said, "[Y]ou might as well hit her again."  He then struck [Ms. Halliburton] repeatedly with the sharpener and heard [her] say his name before "the sounds [went] off" and he stopped hearing anything.

Id.  Ms. Halliburton crawled to the kitchen where Petitioner continued to hit her.

At that point, E.H. came downstairs, jumped on Petitioner, and began scratching him in the face and hitting him as hard as she could.  Id.  Petitioner said that "he saw E.H.'s mouth screaming at him," but "he could not hear anything."  Id.  He acknowledged that he continued to hit [Ms. Halliburton] until E.H. eventually got the knife sharpener away from him.  Id.  When Ms. Halliburton exited the kitchen, Petitioner followed her, grabbed her with both hands and threw her onto the concrete floor of the garage where he then kicked her two times.  Id. at *6–7.  During questioning about whether he knew he was beating his wife, Petitioner explained that he "was beating a monster to get a monster out of my house."  Id.

E.H. testified that she grabbed the knife sharpener from Petitioner during the Incident and screamed for help.  Id. at *2.  E.H. said that it "[s]eemed like I was just something in the way of stopping him from getting to my mom."  Id. at *3.

Taylor Halliburton, the couple's son who was away at college at the time of the Incident, testified that Petitioner called him at 5:30 p.m. to say that he and Ms. Halliburton were getting a divorce.  Id. at *5.  Around 8:00 p.m., Petitioner told Taylor "that he had just tried to murder [Ms. Halliburton], and that he was expecting the police swat team to come in and get him from the house any minute."  Id.  Taylor said Petitioner sounded calm, just as he did during the first call, but also a little "agitated."  Id.

Neighbors Charles Penland and Lynn Brotchner testified that they heard Ms. Halliburton's and E.H.'s screams the night of the Incident and approached the Halliburton residence.  Id. at *2.  When Penland saw E.H. wrestling with Petitioner in an attempt to protect Ms. Halliburton, Penland yelled for Petitioner to stop and drop his weapon.  Id. at *2–3.  Petitioner eventually dropped the weapon, which E.H. grabbed and gave to Penland.  Id. at *3.  Brotchner testified that she called

911.  Id.  While she was on the phone, Brotchner heard the Petitioner say, "That's my wife.  I can beat her all I want."  Id.

Neighbors David and Peggie Compton also testified about hearing screams the night of the Incident.  Id. at *2.  Mr. Compton said that he called 911.  Id.  As he approached the Petitioner's home, he saw Ms. Halliburton kneeling on the garage floor "totally covered in blood."  Id.  Mrs. Compton said she heard E.H. yelling, "[N]o, dad, stop, stop," and she saw E.H. clawing at Petitioner's face as she tried to protect her mother.  Id.  After another neighbor yelled for the Petitioner to stop, Mrs. Compton said she heard Petitioner say, "[T]his is my wife.  I'll beat her if I want to."  Id.

Lieutenant Kevin Simpson testified that he went to the jail after Petitioner's arrest to inform him of his bond.  Id. at *3.  Lieutenant Simpson heard Petitioner say, "[S]he f[-----] everything up and I put the icing on the cake."  Id.

Petitioner called 911 after police officers surrounded his home.  Id. at *4.  The State played a recording of the 911 call for the jury.  Id.  During the call, Petitioner said, "I just snapped, I just lost it, I totally lost it, I couldn't, I just can't believe that this person did this to me after all the time I put into this relationship."  Id. at *4.  The jury also heard that Captain Molina convinced Petitioner to exit the Halliburton home the night of the Incident, and he testified that Petitioner was calm when taken into custody.  Id.

Detective Kim Clark photographed the crime scene and took the Ms. Halliburton's statement.  Id. at *5.  Detective Clark testified at trial that the photographs depicted a trail of blood from the den into the kitchen and the garage.  Id. at *5.  Several photographs of the crime scene and the Ms. Halliburton's injuries were published to the jury.  Id.  Detective Clark said she collected E.H.'s bloody clothes from the attack, and these were also published to the jury.  Id.

Because of Petitioner's attack, Ms. Halliburton sustained several serious cuts to her head, which required one to two hours to close with stitches.  Id. at *2.  Petitioner severed the top of Ms. Halliburton's left ring finger; split her lip up to her nose; and broke her right pinky finger.  Id. at *2, *5.  Ms. Halliburton said that the pain from her head trauma "never goes away."  Id. at *2.  She underwent two surgeries on her severed left finger and the joint of her right pinky finger.  Id.  The severity of her injuries prevented her from working for six months.  Id.

Petitioner did not dispute being the attacker or the nature of the attack.  See id. at *7.  The only contested issue was the defense's theory of insanity.  (ECF No. 13-17 at PageID 2600.)  See also Halliburton I, 2016 WL 7102747, at *12–13; Halliburton v. Tennessee, No. W2019-01458-CCA-R3-PC, 2020 WL 4727434, at *1–3 (Tenn. Crim. App. Aug. 13, 2020) ("Halliburton II").  Petitioner argued that he was not guilty by reason of insanity at the time of the Incident or, alternatively, was incapable of forming the requisite culpable mental states for the offenses.  Halliburton I, 2016 WL 7102747, at *1.

Dr. John Ciocca, the defense's psychologist, testified that he reviewed Petitioner's medical records, psychological records, and the information disclosed during discovery.  Id. at *8.  Dr. Ciocca also conducted interviews and evaluated Petitioner.  Id.  After conducting his evaluation, Dr. Ciocca concluded that Petitioner "was suffering significantly from . . . a Brief Psychotic Disorder at or about the time of [the attack]."  Id.  He explained that Brief Psychotic Disorder (BPD) is an official and accepted diagnosis of a sudden illness "in which a person loses contact with reality, distorts the images and events and people around them, becomes delusional, and behaves in a way that is uncharacteristic for them during the course of their normal life."  Id.  He stated that BPD "may or may not be associated with another illness . . . and is often brought on by stressors."  Id.  He noted that Petitioner had voluntarily admitted himself to Lakeside Hospital

within twenty-four hours of being released on bond, which was five days after the Incident.  Id. Lakeside's admission diagnosis for Petitioner was "recurrent depression, psychotic."  Id.  Dr. Ciocca said a person who is psychotic has "difficulty with their ability to perceive reality in the way that the average person does."  Id.

The State presented testimony from Dr. Lynne Zager to rebut Dr. Ciocca's expert testimony.  Id. at *9.  The court accepted Dr. Zager as an expert in the field of psychology, and she testified that she received a court order to conduct a forensic evaluation of Petitioner.  Id.  Dr. Zager interviewed Petitioner and Ms. Halliburton, reviewed available records and reports (including Dr. Ciocca's letters), and listened to the recording of Petitioner's 911 call.  Id.

Dr. Zager testified that Petitioner could "appreciate the nature and wrongfulness of his actions" when he attacked Ms. Halliburton.  Id.  The State did not ask Dr. Zager to determine whether Petitioner could form the requisite mental states for the offenses, and she noted at trial that she did not see any conclusion in Dr. Ciocca's report on that issue.  Id.  After listening to the 911 call, Dr. Zager concluded that Petitioner "was oriented as to time, place[,] and person; was rational in his statements to the police negotiator; and showed no signs of psychosis during this phone call."  Id. at *10.  She remarked that Petitioner had been evaluated by several different mental health providers, but the only person who diagnosed him with BPD was Dr. Ciocca.  Id.

On May 9, 2015, the jury returned a guilty verdict on all charges.  Id. at *1.  (See also ECF No. 13-8 at PageID 2401.)  The trial court sentenced Petitioner to an effective sentence of twenty years.  (ECF No. 13-9 at PageID 2422–45.)  On August 7, 2015, Judge Carolyn Wade Blackett granted Petitioner's motion for a new trial and later recused herself.  Halliburton I, 2016 WL 7102747, at *1.  (See also ECF No. 13-9 at PageID 2459, 2466.)

The Tennessee Criminal Court of Appeals ("TCCA") granted the State's application for an extraordinary appeal. Halliburton I, 2016 WL 7102747, at *1. (See also ECF No. 13-1 at PageID 1500–08; ECF No. 13-11 at PageID 2482–90.) The TCCA remanded the matter for a new sentencing hearing and a hearing on the motion for new trial, which occurred on November 2, 2015. Halliburton II, 2020 WL 4727434, at *1. (See also ECF No. 13-1 at PageID 1508; ECF No. 13-11 at PageID 2482–90; ECF No. 13-16 at PageID 2533–77.)

Judge J. Robert Carter, Jr., serving as thirteenth juror for the successor trial court, (1) approved the jury's verdict; (2) merged the convictions on the Assault Charges and Domestic Assault Charge with his conviction on the Attempted Murder Charge; (3) imposed a twenty-one-year sentence; and (4) denied the motion for new trial. Halliburton II, 2020 WL 4727434, at *1. (See also ECF No. 13-1 at PageID 1511–15; ECF No. 13-16 at PageID 2533–77.)

### B.  Direct Appeal

On November 5, 2015, Halliburton filed a direct appeal (ECF No. 13-1 at PageID 1517), raising four issues: (1) insufficiency of the evidence; (2) errors in the admission of evidence; (3) the judge's abuse of discretion in precluding cross-examination about the Ms. Halliburton's "family problems"; and (4) the judge's departure from the jury's presence during a ten-minute courtroom recess. (ECF No. 13-17 at PageID 2580.) The TCCA affirmed. Halliburton I, 2016 WL 7102747, at *1, *23. (See also ECF No. 13-19 at PageID 2669–2702.) The Tennessee Supreme Court ("TSC") denied Halliburton's application for discretionary review. (ECF No. 13-20 at PageID 2703–10; ECF No. 13-21 at PageID 2756.)

### C.  Post-Conviction Proceedings

On February 9, 2018, Petitioner filed a pro se petition for post-conviction relief, alleging three claims: (1) "denial of effective assistance of counsel"; (2) "illegal evidence"; and (3) "other

grounds." (ECF No. 13-22 at PageID 2805–12 ("PCR Petition").)  Appointed counsel Charles W. Summers[2] (see id. at PageID 2813–16) filed an amended petition for post-conviction relief (ECF No. 13-22 at PageID 2819–98 ("Amended PCR Petition")) that: (1) claimed that "[i]neffective assistance of trial counsel . . . denigrated the [Petitioner]" (id. at PageID 2869); (2) raised forty-two specific allegations of ineffective assistance of counsel ("IAC") (id. at PageID 2828–88); (3) asserted eight claims of plain error about the police and the trial court (id. at PageID 2889–97); and (4) raised a claim of cumulative error (id. at PageID 2898).

The post-conviction trial court held an evidentiary hearing, at which Petitioner, Dr. Ciocca, and defense counsel Blake Ballin testified.  (ECF Nos. 13-23, 13-24, 13-25, 13-26.)   After reviewing the testimony from the evidentiary hearing, the post-conviction trial court denied relief on July 26, 2019.  (ECF No. 13-22 at PageID 2905–10.)  Relying on Strickland v. Washington, 466 U.S. 668, 687 (1984), the court concluded that Petitioner "has not prove[n] that his trial attorney's performance was deficient.  [The] Petitioner simply does not accept the fact that the jury did not agree with him.  Petitioner has not carried his burden of proof."  (ECF No. 13-22 at PageID 2910.)  See also Halliburton II, 2020 WL 4727434, at *3.

Petitioner appealed the denial of post-conviction relief, raising two IAC issues: (1) Ballin rendered IAC by failing to keep Dr. Ciocca in the courtroom to observe the testimony of Petitioner and Dr. Zager and failing to call Dr. Ciocca to testify in surrebuttal (collectively, "PCR IAC-Ciocca Claim"); and (2) Ballin rendered IAC by allowing his relationship with Petitioner to deteriorate, resulting in poor communication ("PCR IAC-Relationship Claim").  Halliburton II, 2020 WL 4727434, at *3.  (See also ECF No. 13-27 at PageID 3162–64.)  The State filed a response

---

[2]  In June 2018, Summers withdrew as Petitioner's counsel due to a conflict of interest.  (ECF No. 13-22 at PageID 2815–16.)  Attorney Benjamin Wilkins substituted for Summers.  (ECF No. 13-22 at PageID 2817–18; ECF No. 13-23 at PageID 2918.)

and the Petitioner replied.  <u>Halliburton II</u>, 2020 WL 4727434, at *3.  (<u>See</u> <u>also</u> ECF No. 13-28 at

PageID 3167, 3177, 3179–80; ECF No. 13-29 at PageID 3188–90.)  On August 13, 2020, the

TCCA affirmed the denial of post-conviction relief.  <u>Halliburton II</u>, 2020 WL 4727434, at *1, *5.

(<u>See</u> <u>also</u> ECF No. 13-30 at PageID 3193–98.)  The TSC denied Petitioner's request for

discretionary review.  (ECF No. 13-32 at PageID 3256.)

### D.  § 2254 Petition

Halliburton's § 2254 Petition presents the following thirty-two (32) habeas claims:

1.  Trial counsel Ballin rendered IAC when he failed to object to the trial court's ruling that limited the defense's presentation of testimony about the Ms. Halliburton's family history (ECF No. 1-2 at PageID 14) ("Claim 1");

2.  Ballin rendered IAC by:
    (a) "fail[ing] to object to and appeal the unscientific methodology of [Dr. Zager]" (ECF No. 1-3 at PageID 22) ("Claim 2-A"); and
    (b) failing to challenge Dr. Zager's false testimony offered in rebuttal to Dr. Ciocca's testimony (<u>id.</u>) ("Claim 2-B");

3.  Ballin rendered IAC when he failed to cross-examine Dr. Ciocca about the alleged "stressors" that Petitioner says caused his BPD.  (ECF No. 1-4 at PageID 27) ("Claim 3");

4.  Ballin rendered IAC by:
    (a) failing to object to the timing of the State's disclosure of Petitioner's recorded 911 call (ECF No. 1-5 at PageID 44) ("Claim 4-A");
    (b) failing to challenge the State's motion in limine concerning the 911 call (<u>id.</u> at PageID 45) ("Claim 4-B");
    (c) failing to object to Dr. Zager's allegedly false testimony about the date of Petitioner's first reports to physicians of hallucinations (<u>id.</u> at PageID 45–46) ("Claim 4-C");
    (d) failing to object to the prosecution's comments to the trial judge after the court granted Petitioner a new trial (<u>id.</u> at PageID 44–49) ("Claim 4-D");
    (e) failing to object to counsel's "disparaging conversation about the judge directly in fro[nt] of the jury" while the judge was absent (<u>id.</u> at PageID 46) ("Claim 4-E");
    (f) failing to object to the prosecution's closing arguments that (i) "left a photo of the [Ms. Halliburton's] injuries on the screen during the defense's close," (ii) "testified as an expert regarding the meaning of malingering," and (iii) "claimed the NGRI defense proffered by [P]etitioner was simply a ruse to escape incarceration" (<u>id.</u> at PageID 48–49) (collectively, "Claim 4-F");

(g) failing to object to four "intentional, bad-faith misrepresentations" by the State during direct appeal (id. at PageID 50–51) ("Claim 4-G"); and

(h) "mak[ing] no objection to witnesses sitting in the jury box intimidating [Petitioner] over two days of testimony" during the post-conviction evidentiary hearing (id. at PageID 52) ("Claim 4-H")[3];

5. Ballin rendered IAC "throughout the proceedings" when:

(a) Ballin "told the jury [in his opening statement] that Dr. Ciocca would testify to the stressors that caused Petitioner's Brief Psychotic Disorder" (ECF No. 1-6 at PageID 57) ("Claim 5-A");

(b) Ballin did "not hand[] [Dr. Ciocca] the 911 call evidence from the State until one month prior to trial" (id. at PageID 58) ("Claim 5-B");

(c) Ballin "did no investigation into Dr. Ali's potential testimony at all, and he had no idea if Dr. Ali's testimony would confuse the jury or not" (id. at PageID 59) ("Claim 5-C");

(d) Ballin did not "adequately prepare[] . . . character witnesses for Petitioner," including Bagwell, Pehlinova, Ferkin, and Petitioner himself (id. at PageID 59–60) ("Claim 5-D");

(e) Ballin failed to call Cheryl Cooley and Renee Pembroke to impeach the Ms. Halliburton's credibility "as to her reputation for honesty" (id. at PageID 60) ("Claim 5-E");

(f) Ballin "engaged in unprofessional conduct that was prejudicial to his client" (id. at PageID 61) ("Claim 5-F");

(g) Ballin did not appeal "the trial court's interference with communication between Petitioner and counsel [by] forc[ing] [Petitioner] to sit directly behind his attorney during trial" (id. at PageID 63–64) ("Claim 5-G");

(h) Ballin did not challenge Judge Carter's determination that Petitioner was not entitled to a new trial following the State's successful extraordinary appeal (id. at PageID 65) ("Claim 5-H"); and

(i) Ballin "admitted he stopped using his legal judgment and merely did what Petitioner wanted"; "admitted he did not want to pursue an NGRI defense, and as the evidence shows his pursuit of a defense he did not want to pursue was self-defense at best and malicious at worst"; and his "malice toward Petitioner and his contempt for the law became crystal clear to Petitioner on examination of the post-conviction transcript." (Id. at PageID 65–67) ("Claim 5-I");

6. Trial counsel rendered IAC by failing to move for dismissal of the indictment based on denial of a fair hearing and right to a speedy trial (ECF No. 1-7 at PageID 68) ("Claim 6");

7. Post-conviction trial counsel Wilkins rendered IAC by:

---

[3] Petitioner presents Claim 4-H as an IAC claim against trial counsel. Arising from counsel's conduct during the post-conviction hearing, Claim 4-H is, however, properly construed as a claim of IAC against post-conviction trial counsel. Therefore, the instant Order construes Claim 4-H as an IAC claim against post-conviction counsel.

(a) failing to challenge Judge Carter's qualification to serve as the thirteenth juror under State v. Ellis, 453 S.W.3d 889 (Tenn. 2015) (ECF No. 1-8 at PageID 76, 78–79);

(b) failing to challenge Judge Carter's "intimidation of Petitioner from the bench" during the post-conviction evidentiary hearing (id. at PageID 76);

(c) failing to challenge Judge Carter's "use of perjured testimony given by trial counsel" (id. at PageID 76–77);

(d) failing to move to recuse Judge Carter (id. at PageID 80); and

(e) failing to request a copy of the audio recording of the post-conviction hearing to "capture the noise level and lack of decorum in the court while Petitioner testified" (id. at PageID 83) (collectively, "Claim 7");

8. Ballin rendered IAC relating to (a) Judge Blackett's recusal and (b) the trial court's determinations on remand (i) about the new trial motion and (ii) as thirteenth juror (ECF No. 1-9 at PageID 88) ("Claim 8");

9. Wilkins rendered IAC by "not advocat[ing] for Petitioner in the face of outrageous judicial, prosecutorial and trial counsel misconduct" (ECF No. 1-10 at PageID 102) ("Claim 9");

10. Ballin rendered IAC by "not object[ing] to the Tennessee Supreme Court's unconstitutional ruling in State v. Ellis, 453 S.W.3d 889 (Tenn. 2015)" (ECF No. 1-11 at PageID 115) ("Claim 10");

11. Ballin rendered IAC by "not object[ing] to the Tennessee Supreme Court's ruling in State v. Flake, 88 S.W.3d 540 (Tenn. 2002)" (ECF No. 1-12 at PageID 122) ("Claim 11"); and

12. AEDPA is an unconstitutional violation of the separation-of-powers doctrine, the Suspension Clause, and the Supremacy Clause by constraining the judiciary's power through a highly deferential standard of review.  (ECF No. 1-13 at PageID 130.) ("Claim 12")

(See also ECF No. 32 at PageID 3658–60.)  Petitioner seeks that his convictions be vacated, the charges against him dismissed, his immediate release, and that he not be tried again.  (ECF No. 1-14 at PageID 139–40.)

The Court directed Respondent to file the state-court record and answer the § 2254 Petition (ECF No. 5), which he did (ECF No. 13, 14).  In his Answer, Respondent argues that:

(1)  Grounds 1–8 and 10–11 are procedurally defaulted, and Petitioner has not demonstrated cause and prejudice to excuse the procedural default of those claims. (ECF No. 14 at PageID 3270–3309);

11

(2)  Ground 9 is not cognizable under § 2254 (id. at PageID 3303–04); and

(3)  Ground 12 "lacks any merit."  (Id. at PageID 3306–07.)

Petitioner filed an eighty-seven-page reply.  (ECF No. 24 ("Reply").)[4]

## STANDARDS OF REVIEW

### A.  Exhaustion

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting to the state courts the same claim sought to be redressed in a federal habeas petition.  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  The petitioner must "fairly present" each claim to each appropriate state court, Baldwin v. Reese, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, O'Sullivan v. Boerckel, 526 U.S. 838, 847–48 (1999).  Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies." Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

To fairly present a federal claim, a prisoner must present the same facts and legal theory to the state courts as is raised in his federal habeas petition.  See Anderson v. Harless, 459 U.S. 4, 6–7 (1982); Picard v. Connor, 404 U.S. 270, 276-77 (1971); Hodges v. Colson, 727 F.3d 517, 529 (6th Cir. 2013) ("The exhaustion doctrine requires the petitioner to present the same claim under the same theory to the state courts before raising it on federal habeas review") (internal quotation marks and alteration omitted).  In evaluating whether a prisoner has "fairly presented" a claim to

---

[4]  That same day, Petitioner filed a Motion to Expand the Record, asking the Court to consider numerous documents that are not part of the state-court record.  (ECF No. 25.)  Respondent filed a response.  (ECF No. 26.)  On July 6, 2022, the Court denied Petitioner's Motion to Expand the Record.  (ECF No. 32.)

a state appellate court, the controlling document is the petitioner's brief.  See Baldwin, 541 U.S. at 32 ("[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so.").

Where a state prisoner's claim has been adjudicated on the merits in state court, a federal court can issue a writ only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  A petitioner carries the burden of proof for this "difficult to meet" and "highly deferential standard," which "demands that state-court decisions be given the benefit of the doubt."  Cullen, 563 U.S. at 181 (internal quotation marks and citations omitted).  A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412–13 (2000).  "[A] run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  Id. at 406.

## B.  Procedural Default

The procedural default doctrine is ancillary to the exhaustion requirement.  See Edwards v. Carpenter, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine).

If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87–88 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011).

If a claim has never been presented to the state courts but a state court remedy is no longer available, such as when an applicable statute of limitations bars a claim, the claim is technically exhausted due to the expiration of potential remedies but still barred by procedural default. Coleman v. Thompson, 501 U.S. 722, 731–32 (1991). Tennessee's one-year statute of limitations and "one-petition" rule on post-conviction petitions generally prevent a return to State court to litigate any additional constitutional claims. See Tenn. Code Ann. §§ 40-30-102(a) (one-year limitation period), 40-30-102(c) ("one-petition" rule); Hodges, 727 F.3d at 530 (noting that a Tennessee petitioner "no longer has any state court remedies to exhaust" when he failed to present claim in initial post-conviction petition). To avoid procedural default, a habeas petitioner in Tennessee must present his federal claims to the trial court and, on appeal, to the TCCA. Covington v. Mills, 110 F. App'x 663, 665 (6th Cir. 2004).

To excuse a procedural default, a petitioner must show (1) cause to excuse his failure to present the claim and (2) actual prejudice stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. Schlup v. Delo, 513 U.S. 298, 320–21 (1995); Coleman, 501 U.S. at 750; House v. Bell, 547 U.S. 518, 536–39 (2006). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Davila v. Davis, 582 U.S. 521, 528 (2017) . "A factor is external to the defendant if it 'cannot fairly be attributed to' the prisoner." Id. (quoting Coleman, 501 U.S. at 753). To establish

prejudice, a petitioner must show that the errors at his trial "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Garcia-Dorantes v. Warren, 801 F.3d 584, 598 (6th Cir. 2015) (internal quotation marks omitted). The burden of showing cause and prejudice is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999). To demonstrate a fundamental miscarriage of justice, a petitioner must establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. Schlup, 513 U.S. at 321.

The ineffectiveness of post-conviction counsel may be cause to excuse the default of a substantial IAC claim. Trevino v. Thaler, 569 U.S. 413, 423 (2013) (citing Martinez v. Ryan, 566 U.S. 1, 16–17 (2012)). For a procedural default to be excused under Martinez, a petitioner must demonstrate:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim;
>
> (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding;
>
> (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and
>
> (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

Id. (quoting Martinez, 566 U.S. at 16–17). A claim is substantial if it has "some merit" based on the controlling standard for IAC stated in Strickland. Martinez, 566 U.S. at 14.

Under Martinez, ineffective assistance of post-conviction counsel does not create cause to excuse the procedural default of a claim of ineffective assistance of appellate counsel. See Davila, 582 U.S. at 528; Hodges, 727 F.3d at 531. In the Supreme Court's subsequent decision in Trevino, 569 U.S. at 429, the Supreme Court extended its holding in Martinez to states in which a "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical

case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." Thus, the decision in <u>Trevino</u> modified the fourth requirement under <u>Martinez</u> for overcoming a procedural default. <u>See id.</u> The Sixth Circuit, in <u>Sutton v. Carpenter</u>, 745 F.3d 787 (6th Cir. 2014), held that IAC of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective.

## ANALYSIS

### A. Exhausted IAC claim against trial counsel

In Claim 3, Petitioner alleges trial counsel Ballin provided ineffective assistance by failing to "cross-examine"[5] Dr. Ciocca about how "stressors" from the Victim's family caused Petitioner's mental state. (ECF No. 1-4 at PageID 32, 34.) Petitioner contends that Ballin should have asked Dr. Ciocca to remain in the courtroom to hear the testimony of Dr. Zager, to enable Dr. Ciocca to testify in rebuttal "concerning the flaws and inconsistencies in Dr. Zager's methodology and testimony." (<u>Id.</u> at PageID 33.) This claim was exhausted before the TCCA and entitled to habeas review on the merits.[6] <u>Halliburton II</u>, 2020 WL 4727434, at *3. (<u>See also</u> ECF No. 13-27 at PageID 3162–63 (raising the PCR IAC-Ciocca Claim during post-conviction appellate proceedings).)

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in <u>Strickland v. Washington</u>, 466

---

[5] The Court construes Petitioner's use of the term "cross-examine" to mean calling defense expert Dr. Ciocca as a rebuttal witness to Dr. Zager, the State's expert.

[6] Petitioner does not allege in the § 2254 Petition the other claim that he presented to the TCCA during his post-conviction appeal, the PCR IAC-Relationship Claim.

U.S. 668 (1984).  To demonstrate deficient performance by counsel, a petitioner must demonstrate

that "counsel's representation fell below an objective standard of reasonableness."  Id. at 688.

> A court considering a claim of ineffective assistance must apply a "strong
> presumption" that counsel's representation was within the "wide range" of
> reasonable professional assistance.  The challenger's burden is to show "that
> counsel made errors so serious that counsel was not functioning as the 'counsel'
> guaranteed the defendant by the Sixth Amendment."

Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687, 689) (internal

citations omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."

Strickland, 466 U.S. at 694.[7]  "A reasonable probability is a probability sufficient to undermine

confidence in the outcome."  Id.  "It is not enough 'to show that the errors had some conceivable

effect on the outcome of the proceeding.'"  Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S.

at 693).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial

whose result is reliable.'"   Id.; see also id. at 111–12 ("In assessing prejudice under Strickland,

the question is not whether a court can be certain counsel's performance had no effect on the

outcome or whether it is possible a reasonable doubt might have been established if counsel acted

differently. . . . The likelihood of a different result must be substantial, not just conceivable.")

(citations omitted); Wong v. Belmontes, 558 U.S. 15, 27 (2009) (per curiam) ("But Strickland does

not require the State to 'rule out' [a more favorable outcome] to prevail.  Rather, Strickland places

---

[7]  "[A] court need not determine whether counsel's performance was deficient before examining
the prejudice suffered by the defendant."  Strickland, 466 U.S. at 697.  If a reviewing court finds
a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient.
Id.

the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." (citing Strickland, 466 U.S. at 694)).

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.   Even under de novo review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence."  The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

Richter, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 689–90) (internal citations omitted).

Here, Petitioner claimed during the post-conviction appeal that Ballin was ineffective for failing to keep Dr. Ciocca in the courtroom to observe Petitioner's testimony and that of the State's rebuttal expert witness and not calling Dr. Ciocca to testify in surrebuttal.  (See ECF No. 13-30 at PageID 3196.)  Petitioner argued that "Dr. Ciocca would have also been available to . . . be recalled for explanation of the various stressors that Appellant testified to in an effort to more fully explain his diagnosis of [Petitioner]."  (ECF No. 13-27 at PageID 3163.)

The TCCA concluded that Petitioner failed to demonstrate Strickland's defective performance and prejudice prongs, explaining:

> [T]he Petitioner has failed to prove that he received ineffective assistance of counsel.  At the evidentiary hearing, Dr. Ciocca testified that the Petitioner's family would have incurred an additional charge for his continued presence in the courtroom.  Counsel testified that he did not see any "reason to have [Dr. Ciocca] come sit and listen to [the State's expert's] testimony" because counsel consulted with Dr. Ciocca ahead of time about his cross-examination of the State's expert based on her anticipated testimony.  We cannot conclude that counsel's advance

18

preparation and not incurring additional expense was deficient so as to fall below an objective standard of reasonableness. In addition, the Petitioner did not elicit proof at the evidentiary hearing regarding what questions Dr. Ciocca could have suggested to counsel had he remained in the courtroom that would have called the State's expert's testimony into question or what proof Dr. Ciocca could have offered had he been called in surrebuttal. Therefore, the Petitioner has not met his burden of establishing prejudice.

Halliburton II, 2020 WL 4727434, at *4. (See also ECF No. 13-30 at PageID 3198.)

To the extent Petitioner suggests in Claim 3 that Ballin should have attacked Dr. Zager's methods and opinion via rebuttal testimony from Dr. Ciocca, his contention is not well taken. The Court's task on IAC claims is "not to grade counsel's performance." See Strickland, 466 U.S. at 697. Nor does the Court ask whether the attorney could have performed better, or whether "some novel, unenacted strategy might have led to a better outcome for the client." Dickerson v. Johnson, No. 3:14-cv-01717, 2021 WL 1165971, at *2 (M.D. Tenn. Mar. 25, 2021) ("Strickland addresses only the small class of cases in which 'counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment' at all, and does not operate as a catch-all mechanism for 'fixing' trials we might have conducted differently.") (internal citation omitted). Petitioner has never (1) identified the specific area(s) of Dr. Zager's testimony that he claims Ballin should have challenged; or (2) demonstrated how he was prejudiced by Ballin's performance in that regard. Petitioner fails to demonstrate both Strickland prongs for an IAC claim. He cannot show that the TCCA unreasonably applied Strickland or that its decision was based on an unreasonable determination of the facts.

What is more, the record demonstrates that, in fact, the jury heard evidence about Petitioner's "stressors." For example, the call between Petitioner and Captain Molina allowed the jury to hear Petitioner's various statements about Ms. Halliburton's spending habits; her belief that Petitioner could not satisfactorily provide for his family; that her father "expos[ed] himself to girls

in the neighborhood"; that "her sister . . . had multiple affairs, screws people and gets their money and then the brother . . . sleeps with men on the internet[.]"  Halliburton I, 2016 WL 7102747, at *4.

Petitioner himself also testified extensively about these alleged stressors.  See id. at *5–6. Petitioner said that Ms. Halliburton withdrew from intimacy soon after they were married (ECF No. 13-7 at PageID 2254); that she "frequently undermined" his parenting decisions (Halliburton I, 2016 WL 7102747, at *5); that she threatened him with divorce several times throughout their marriage (ECF No. 13-7 at PageID 2255); that she told Petitioner "he would never make enough money to make her happy" (id. at PageID 2269); that, although her father "tried to pretend he was a good citizen, he was dishonest" and allegedly "molested two girls in the neighborhood" (Halliburton I, 2016 WL 7102747, at *6); and that her family "generally mistreated" Petitioner (id.).  Petitioner's father allegedly called him "scum of the earth," and Petitioner "told [his daughter] that the reason he did not like visiting the victim's family was because [Ms. Halliburton's] father was a pedophile."  Id. at *7.  Petitioner said that "the stressors that triggered his attack . . . were the result of problems with his family and [Ms. Halliburton's] family."  Id.

Further, Dr. Ciocca testified that BPD was "often brought on by stressors."  Id. at *8.  Dr. Ciocca "identified several stressors that could have triggered" Petitioner's attack on Ms. Halliburton, including the "unsatisfactory" marriage; Petitioner's concern over Ms. Halliburton's spending and dishonesty; her general disrespect for Petitioner; and her refusal to have sex with him.  Id.

The TCCA cited and reasonably applied Strickland when it concluded that Petitioner failed to show defective performance by Ballin concerning the presentation of Dr. Ciocca's testimony. Halliburton II, 2020 WL 4727434, at *3.  Any further testimony that could have been elicited from

Dr. Ciocca as a rebuttal witness about Petitioner's "stressors" would have been merely cumulative and would not have resulted in a reasonable probability of a different trial outcome.  See Strickland, 466 U.S. at 694; see also Sutton v. Bell, 645 F.3d 752, 760 (6th Cir. 2011) (finding that "additional evidence would have been cumulative and added little to no extra" value).  Petitioner has not demonstrated Strickland's prejudice prong.

Petitioner also contends in Claim 3 that the post-conviction trial court made an unreasonable determination of the facts when it concluded that Dr. Ciocca testified "fully and thoroughly." (ECF No. 1-4 at PageID 34–35 ("Dr. Ciocca testified that there was a Brief Psychotic Disorder but not why the Brief Psychotic Disorder occurred.").)  The issues raised and decided only during post-conviction trial proceedings are of no moment on federal habeas review.  See Covington, 110 F. App'x at 665 (to avoid procedural default, a federal habeas petitioner in Tennessee must present his federal claims to the TCCA).  In any event, the record contradicts Petitioner's argument.  Dr. Ciocca in fact explained that BPD "is often brought on by stressors." See Halliburton I, 2016 WL 7102747, at *8.  (See also ECF No. 13-6 at PageID 2109–11.)

Petitioner also argues in Claim 3 that Judge Carter excused himself from a prejudice determination while acting as thirteenth juror.  (ECF No. 1-4 at PageID 35.)  Petitioner misunderstands Strickland's governing principle.  Judge Carter expressly found that Petitioner did not demonstrate the first Strickland prong of ineffective assistance of counsel and, for that reason, Judge Carter did not have to determine prejudice.  (ECF No. 13-22 at PageID 2909–10.)  See Strickland, 488 U.S. at 697 (because both prongs must be satisfied to establish IAC, if a petitioner cannot satisfy one prong, the other need not be considered).

Petitioner has not shown (1) that the TCCA's decision was contrary to, or involved an unreasonable application of Strickland, or (2) that the TCCA's decision was based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d)(1)–(2). For that reason, Claim 3 is **DENIED**.

### B. Unexhausted IAC claims against trial counsel

As explained below, Petitioner's IAC allegations against trial counsel Ballin in Claims 1, 2, 4, 5, 6, 8, 10, and 11 of the § 2254 Petition are unexhausted IAC claims. In addition, Petitioner did not make any effort to overcome the procedural default of Claims 1, 2, 4, 5, 6, 8, 10, and 11 (collectively, the "Procedurally Defaulted Claims"); did not demonstrate ineffective assistance by post-conviction counsel as it relates to the Procedurally Defaulted Claims; and did not show that the Procedurally Defaulted Claims are substantial.

Claim 1 alleges Ballin delivered ineffective assistance by "fail[ing] to object to and appeal the trial court's improper in limine ruling suppressing . . . all mention of the sexual perversity and addiction in the [Ms. Halliburton's] family [by] . . . preclud[ing] testimony of Cheryl Cooley[8] and Renee Pembroke." (ECF No. 1-2 at PageID 14–17.) However, Petitioner did not raise any IAC claim about that motion in limine (or any others) before the TCCA on appeal. Halliburton II, 2020 WL 4727434, at *3. (See also 13-27 at PageID 3162–63.) Thus, Claim 1 is unexhausted. See Cullen, 563 U.S. at 181; Baldwin, 541 U.S. at 29; Anderson, 459 U.S. at *6–7; Hodges, 727 F.3d at 529.

In Claim 2-A, Petitioner alleges that his counsel was ineffective for failing to object to and appeal Zager's unscientific methodology. (ECF No. 1-3 at PageID 22.) Petitioner contends that "Dr. Zager's methodology was inadequate" because she did not review "pertinent medical records"; her state-of-mind interview of Petitioner was too brief; and the interview occurred too

---

[8] Cooley is the ex-wife of Ms. Halliburton's brother, Clay Cooley. (ECF No. 13-7 at PageID 2145.) Pembroke is Ms. Halliburton's former sister-in-law. (Id. at PageID 2133.)

long after the Incident to adequately support her testimony.  (Id. at PageID 23–24.)  He says that "Dr. Zager effectively admitted that her methods were inadequate to support her testimony, but the Court allowed her testimony anyway—counsel did not move to exclude her testimony and did not move to strike her testimony."  (Id.)  Petitioner did not raise a claim about Dr. Zager during post-conviction appellate proceedings.  Halliburton II, 2020 WL 4727434, at *3.  (See also ECF No. 13-27 at PageID 3162–63 (asserting only the PCR IAC-Ciocca Claim and the PCR IAC-Relationship Claim before the TCCA).)  He has not exhausted Claim 2-A.  See Cullen, 563 U.S. at 181; Baldwin, 541 U.S. at 29; Anderson, 459 U.S. at *6–7; Hodges, 727 F.3d at 529.

In Claim 2-B, Petitioner alleges IAC by Ballin in not challenging Dr. Zager's "false testimony."  (ECF No. 1-3 at PageID 22.)  He argues that Dr. Zager "lied on the stand in support of her diagnosis [of Petitioner] at the encouragement of the State" by "repeatedly den[ying] that there were any reports of hallucinations by Petitioner to any medical professional until December of 2012."  (Id. at PageID 24.)  Petitioner did not present Claim 2-B to the TCCA during post-conviction appellate proceedings.  Halliburton II, 2020 WL 4727434, at *3.  (See also ECF No. 13-27 at PageID 3162–63.)  Therefore, Petitioner did not exhaust Claim 2-B.  See Cullen, 563 U.S. at 181; Baldwin, 541 U.S. at 29; Anderson, 459 U.S. at *6–7; Hodges, 727 F.3d at 529.

Petitioner did not raise issues during post-conviction appellate proceedings about Ballin's supposed IAC by: (1) not challenging the timing of the State's disclosure of the 911 call (Claim 4-A); (2) not challenging the State's motion in limine regarding the 911 call (Claim 4-B); (3) not objecting to Dr. Zager's testimony about the date of Petitioner's first report of hallucinations (Claim 4-C); or (4) not objecting to the prosecution's comments made after the trial judge granted a new trial (Claim 4-D).  (ECF No. 1-5 at PageID 44–49; ECF No. 13-27 at PageID 3162–64.) See also Halliburton II, 2020 WL 4727434, at *3.  Claims 4-A, 4-B, 4-C, and 4-D are unexhausted.

See Cullen, 563 U.S. at 181; Baldwin, 541 U.S. at 29; Anderson, 459 U.S. at *6–7; Hodges, 727 F.3d at 529.

Petitioner did not present to the TCCA during post-conviction appeal any IAC claims against Ballin for (1) not objecting to a "disparaging conversation about the judge directly in fro[nt] of the jury," while the judge was absent (Claim 4-E); (2) not objecting to the prosecution's closing argument that (a) used a photo of the Victim's injuries, (b) used the term "malingering," and (c) claimed Petitioner's NGRI defense was a ruse to escape jail (habeas Claim 4-F); and (3) failing to object to four misrepresentations in the State's direct appeal brief (habeas Claim 4-G).  (ECF No. 1-5 at PageID 46–52; ECF No. 13-27 at PageID 3162–64 (raising only the PCR IAC-Ciocca Claim and the PCR IAC-Relationship Claim before the TCCA).)  See also Halliburton II, 2020 WL 4727434, at *3.  Claims 4-E, 4-F, and 4-G are unexhausted.[9]  See Cullen, 563 U.S. at 181; Baldwin, 541 U.S. at 29; Anderson, 459 U.S. at *6–7; Hodges, 727 F.3d at 529.

Similarly, Petitioner did not raise IAC issues during post-conviction appellate proceedings about the issues from which habeas Claim 5 arises: Ballin's opening statement remark about Dr.

---

[9]  Claims 4-E, 4-G, and 5-A are also not properly pled under Habeas Corpus Rule 2(c) of Rules Governing Section 2254 Case in the United States District Courts ("Habeas Rules"), which requires a petition to "state the facts supporting each ground" for relief.  "A petitioner's failure to fulfill the pleading requirements of Habeas Rule 2(c) provides an appropriate basis for dismissal." Grimes v. Mays, No. 3:19-cv-0585, 2022 WL 3582487, at *9 (M.D. Tenn. Aug. 19, 2022) (citing Guerrero v. Ford, No. 1:17-cv-00103, 2019 WL 330878, at *12 (M.D. Tenn. Jan. 25, 2019) (dismissing claim under Habeas Rule 2(c) where petitioner "d[id] not set forth any facts to support his allegation")).  Claim 4-E does not identify the statements Petitioner is challenging or how he was prejudiced by them.  (ECF No. 1-5 at PageID 46 ("Mr. Ballin and Ms. Cook, sitting at table, engaged in a disparaging conversation about the judge directly in front of the jury.").) Claim 4-G, about appellate counsel's failure to object to the State's reliance on "Mrs. Compton's false testimony" (ECF No. 1-5 at PageID 50–51), does not identify the allegedly false testimony at issue.  Claim 5-A does not identify the challenged statement that Ballin allegedly made during his opening statement.  (ECF No. 1-6 at PageID 57 (alleging that "Mr. Ballin told the jury . . . [o]n pp. 13–14 of his Opening Statement . . . that Dr. Ciocca would testify to the stressors that caused Petitioner's Brief Psychotic Disorder").  Petitioner did not have the parties' opening statements transcribed for direct appeal.

Ciocca; the State's production of the 911 call; Dr. Ali's potential testimony; Ballin's preparation

of defense witnesses Maureen Bagwell, Katyusha Pehlinova, Susan Ferkin, and Petitioner;

impeachment testimony from Cooley and Pembroke; Ballin's "unprofessional conduct"; the trial

judge's preclusion of Petitioner sitting at counsel table during trial; failure to challenge to Judge

Carter's ruling on the motion for new trial; or Ballin's alleged perjury at the post-conviction

hearing.   (ECF No. 1-6 at PageID 57–67; ECF No. 13-27 at PageID 3162–64.)   See also

Halliburton II, 2020 WL 4727434, at *3.  Thus, Claims 5-A through 5-I[10] are unexhausted because

Petitioner did not present them to the TCCA.[11] See Cullen, 563 U.S. at 181; Baldwin, 541 U.S. at

29; Anderson, 459 U.S. at *6–7; Hodges, 727 F.3d at 529.

In Claim 6, Petitioner contends that trial counsel was ineffective by "fail[ing] to raise the

issue of the denial of a speedy trial."  (ECF No. 1-7 at PageID 68–73.)  Petitioner did not raise this

claim before the TCCA during post-conviction appellate proceedings.  (ECF No. 13-27 at PageID

3162–64.)  See also Halliburton II, 2020 WL 4727434, at *1, *3.  Therefore, he did not exhaust

---

[10]   The following allegations in Claim 5 overlap with Petitioner's allegations in Claim 2-B and
Claim 3: (a) Ballin failed to prepare Dr. Ciocca to testify about the "stressors" Ms. Halliburton's
family caused Petitioner (ECF No 1-6 at PageID 57–58); (b) Ballin failed to examine Dr. Ciocca
regarding the "stressors" Ms. Halliburton's family caused Petitioner and "failed to cross-examine
Dr. Ciocca regarding Dr. Zager's testimony" (id.); and (c) Ballin should have requested that Dr.
Ciocca be present throughout the trial (id. at PageID 58).   Those three repetitive allegations in
Claim 5 fail for the same reasons explained in the instant Order regarding Claim 2-B and Claim 3.
[11]   What is more, Claim 5-H is not cognizable in federal habeas.  (See ECF No. 1-6 at PageID 65
(contending that Ballin rendered IAC because he did not challenge Judge Carter's determination
that Petitioner was not entitled to a new trial following the State's successful extraordinary
appeal).)  The Supreme Court has never held that a hearing on a motion for new trial is a "critical
stage of a criminal proceeding."   Curtis v. Boyd, No. 3:20-cv-0559, 2023 WL 2699973, at *1
(M.D. Tenn. Mar. 29, 2023) (citing Coleman v. Bergh, 804 F.3d 816, 819 (6th Cir. 2015)) (other
internal citations omitted); see also Reid v. United States, No. 2:15-cv-02118-JPM-tmp, 2018 WL
11303420, at *6–7 (W.D. Tenn. Mar. 26, 2018) (citing Coleman and finding there is no clearly
established federal right to counsel at a hearing on a motion for new trial).

Claim 6 in state court.  <u>See</u> <u>Cullen</u>, 563 U.S. at 181; <u>Baldwin</u>, 541 U.S. at 29; <u>Anderson</u>, 459 U.S. at 6–7; <u>Hodges</u>, 727 F.3d at 529.

In Claim 8, Petitioner contends that trial counsel was ineffective for "fail[ing] to object to the judicial construction that underpinned the retroactive recusal of Judge Blackett, the vacatur of her grant of a new trial to Petitioner, and the assumption of the successor judge he could act a thirteenth juror."  (ECF No. 1-9 at PageID 90.)  Because Petitioner did not raise Claim 8 during post-conviction appellate proceedings (ECF No. 13-27 at PageID 3162–64; <u>see also</u> <u>Halliburton</u> <u>II</u>, 2020 WL 4727434, at *1, *3), Claim 8 is unexhausted.  <u>See</u> <u>Cullen</u>, 563 U.S. at 181; <u>Baldwin</u>, 541 U.S. at 29; <u>Anderson</u>, 459 U.S. at *6–7; <u>Hodges</u>, 727 F.3d at 529.

In Claim 10, Petitioner argues that trial counsel was ineffective when he failed to object to the Tennessee Supreme Court's "unconstitutional ruling" in <u>State v. Ellis</u>, 453 S.W.3d 889 (Tenn. 2015).  (ECF No. 1-11 at PageID 115.)  He contends that <u>Ellis</u> "conflates weight of evidence determinations and sufficiency determinations" and that counsel's alleged IAC deprived Petitioner of the opportunity to challenge <u>Ellis</u> on appeal.  (<u>Id.</u> at PageID 117.)  In Claim 11, he makes an analogous IAC argument about <u>State v. Flake</u>, 88 S.W.3d 540 (Tenn. 2002), arguing that <u>Flake</u> "makes appellate review of cases involving an NGRI defense meaningless."  (ECF No. 1-12 at PageID 122, 124 (criticizing the Tennessee Supreme Court's choice of a "reasonableness" standard—by which Tennessee appellate courts should reverse a jury verdict that rejected the insanity defense—as "an empty ritual").)  Because Petitioner did not raise Claim 10 or Claim 11 before the TCCA during post-conviction appellate proceedings (ECF No. 13-27 at PageID 3162–64; <u>see also</u> <u>Halliburton II</u>, 2020 WL 4727434, at *1, *3), he failed to exhaust Claims 10 and 11.[12]

---

[12]  In addition, because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," <u>see</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991), this Court cannot accept Claim 10's and Claim 11's invitation to intrude on the state-law questions

See <u>Cullen</u>, 563 U.S. at 181; <u>Baldwin</u>, 541 U.S. at 29; <u>Anderson</u>, 459 U.S. at *6–7; <u>Hodges</u>, 727 F.3d at 529.

In sum, Claims 1, 2, 4, 5, 6, 8, 10, and 11—including their sub-parts—are unexhausted and therefore procedurally defaulted.

Petitioner makes no argument about cause and prejudice or a fundamental miscarriage of justice as it relates to the Procedurally Defaulted Claims.  In fact, Petitioner rejects the notion that he even has the burden of doing so.  (ECF No. 24 at PageID 3393 ("The State keeps making the erroneous claim that Petitioner must show how he was prejudiced by a fundamental constitutional error on the part of his attorney.").)  Petitioner's generalized criticism of post-conviction counsel's performance does not relate to overcoming the procedural default of these claims.  (<u>Id.</u> at PageID 3406 (contending that post-conviction counsel's "d[oing] the bare minimum . . . creates cause and prejudice").)  <u>See</u> <u>Lucas</u>, 179 F.3d at 418; <u>Schlup</u>, 513 U.S. at 320–21.  Nor does Petitioner contend that the Procedurally Defaulted Claims are substantial.  (ECF No. 24 at PageID 3336–3421.)  <u>See</u> <u>Trevino</u>, 569 U.S. at 423.  For these reasons, Petitioner has not met his burden to overcome the procedural default of Claim 1, Claims 2-A and 2-B, Claims 4-A through 4-G, Claims 5-A through 5-I, Claim 6, Claim 8, Claim 10, and Claim 11, which are **DENIED**.

### C.  Non-cognizable IAC claims against post-conviction counsel

Petitioner asserts stand-alone IAC claims against post-conviction counsel Wilkins in Claims 4-H, Claim 7, and Claim 9.  In Claim 4-H, he says that Wilkins failed to object to witnesses "intimidating" Petitioner at the post-conviction evidentiary hearing.  (ECF No. 1-5 at PageID 52.)  In Claim 7, Petitioner contends that Wilkins was ineffective in (1) failing to challenge Judge

---

addressed in <u>Ellis</u> and <u>Flake</u>.  "A federal court may not issue the writ on the basis of a perceived error of state law."  <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984).

Carter's qualification, his "intimidation," and his "use of perjured testimony" (ECF No. 1-8 at

PageID 76, 78–79); (2) not seeking Judge Carter's recusal (id. at PageID 80); and (3) failing to

request a copy of the post-conviction hearing audio recording of the "lack of decorum in the court

while Petitioner testified." (Id. at PageID 83).  In Claim 9, Petitioner says that Wilkins:

> (1) "did not raise a single objection" (ECF No. 1-10 at PageID 105);
> (2) "block[ed] [Petitioner] from testifying about stressors arising from [Ms. Halliburton's] family history of addiction and sexual perversion" (id.);
> (3) "fail[ed] to present evidence of what Dr. Ciocca would have testified to if he had observed Dr. Zager's testimony" (id. at PageID 106);
> (4) "failed to present evidence regarding Ballin's deficient and prejudicial performance in his failure to call Dr. Ali to support Dr. Ciocca's diagnosis" (id. at PageID 109–10);
> (5) did not object to "the gross misconduct of the judge and prosecutors and lies of trial counsel" (id. at PageID 111);
> (6) "refused to raise the issue of Mr. Ballin's perjured testimony to the court" (id.);
> (7) "obstruct[ed] Petition's interests [by] prevent[ing] Petitioner from presenting evidence of prosecutorial and judicial misconduct to the post-conviction court during proof" (id.); and
> (8) "neglect[ed] presenting the thirteenth-juror issue regarding Judge Blackett and Judge Carter to the appellate court" (id. at PageID 113).

"There is no constitutional right to an attorney in state post-conviction proceedings.

Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such

proceedings." Coleman, 501 U.S. at 752 (internal citations omitted).

Claims 4-H, 7, and Claim 9 do not state claims that are cognizable in a federal habeas case

and are **DENIED**.

### D.  Constitutionality of AEDPA

Petitioner contends that AEDPA's habeas standard of review in § 2254(d)(1) is

"unconstitutional."  (ECF No. 1-13 at PageID 132.)[13]   Relying on the separation-of-powers

---

[13]  The sole claim in the § 2254 Petition to which Claim 12's argument would arguably apply is Claim 3.  As discussed in this Order, other than Claim 3, none of Petitioner's claims in the § 2254 Petition are subject to the habeas standard of review because they are, in the first instance, procedurally defaulted for Petitioner's failure to exhaust in state court.

doctrine, the Suspension Clause,[14] and the Supremacy Clause[15] of the United States Constitution, Petitioner argues that Congress has unlawfully constrained the authority of the federal judiciary through AEDPA's highly deferential standard of review that, according to him, effectively suspends the issuance of a writ of habeas corpus.  (Id. at PageID 132–38.)

The argument that AEDPA somehow unconstitutionally constrains the power of federal courts was foreclosed by the Supreme Court's opinion in Williams v. Taylor, 529 U.S. 362 (2000). In Williams, the Supreme Court rejected a construction of § 2254(d) that "would wrongly require the federal courts, including this Court, to defer to state judges' interpretations of federal law," and which the Court suggested might present separation of powers problems.  Id. at 377–79.  The Supreme Court in Williams went on to articulate the proper interpretation of § 2254(d) that did not present such problems.

> The inquiry mandated by [AEDPA's] amendment [to the federal habeas statute] relates to the way in which a federal habeas court exercises its duty to decide constitutional questions; the amendment does not alter the underlying grant of jurisdiction in § 2254(a).  When federal judges exercise their federal-question jurisdiction under the "judicial Power" of Article III of the Constitution, it is "emphatically the province and duty" of those judges to "say what the law is."  At the core of this power is the federal courts' independent responsibility— independent from its coequal branches in the Federal Government, and independent from the separate authority of the several States—to interpret federal law.  A construction of AEDPA that would require the federal courts to cede this authority to the courts of the States would be inconsistent with the practice that federal judges have traditionally followed in discharging their duties under Article III of the Constitution.  If Congress had intended to require such an important change in the exercise of our jurisdiction, we believe it would have spoken with much greater clarity than is found in the text of AEDPA.

---

[14]  "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I, § 9, cl. 2.

[15]  "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

> This basic premise informs our interpretation of both parts of § 2254(d)(1): first, the requirement that the determinations of state courts be tested only against "clearly established Federal law, as determined by the Supreme Court of the United States," and second, the prohibition on the issuance of the writ unless the state court's decision is "contrary to, or involved an unreasonable application of," that clearly established law.

Williams, 529 U.S. at 378–79 (internal citation omitted).  Petitioner presents no basis for this Court to conclude otherwise.  Claim 12 is without merit and **DENIED**.

For the reasons explained in this Order: (1) the § 2254 Petition (ECF No. 1) is **DENIED** and (2) the Motions (ECF No. 43, 44, 45 & 46) are **DENIED** as moot.

## APPELLATE ISSUES

There is no absolute entitlement to appeal a district court's denial of § 2254 petition. Miller-El v. Cockrell, 537 U.S. 322, 335 (2003); Bradley v. Birkett, 156 F. App'x 771, 772 (6th Cir. 2005).  The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  Rule 11, § 2254 Rules.  A petitioner may not take an appeal unless a circuit or district judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing.  28 U.S.C. § 2253(c)(2) & (3).  A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  Miller-El, 537 U.S. at 336 (internal quotation marks omitted); see also Henley v. Bell, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed.  Miller-El, 537 U.S. at

337; <u>Caldwell v. Lewis</u>, 414 F. App'x 809, 814–15 (6th Cir. 2011).  Courts should not issue a COA as a matter of course.  <u>Bradley</u>, 156 F. App'x at 773.

In this case, there can be no question that (1) Claims 1–2 and 4–12 in the § 2254 Petition are procedurally defaulted and (2) Claim 3 is without merit.  Because any appeal by the Petitioner on the issues raised in his § 2254 Petition does not deserve attention, the Court **DENIES** a COA.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, the prisoner must file his motion to proceed in forma pauperis in the appellate court.  <u>See</u> Fed. R. App. P. 24(a)(4)–(5).  In this case, for the same reasons the Court denies a COA, the Court determines that any appeal would not be taken in good faith.  It is therefore **CERTIFIED**, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal in forma pauperis is **DENIED**.[16]

**IT IS SO ORDERED**, this 30th day of September, 2024.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

---

[16]  If the Petitioner files a notice of appeal, he must pay the full $605 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days of the date of entry of this Order.  <u>See</u> Fed. R. App. P. 24(a)(5).